# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| GP3 II, LLC, | ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 20-00424-CV-W-BP |
| BANK OF THE WEST, et al., | ) ) |
| Defendants. | ) ) |

## ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER

On June 2, 2020, Plaintiff GP3 II, LLC ("GP3") filed this action seeking a temporary restraining order ("TRO"), to enjoin Defendants Bank of the West ("BOTW") and Litong Capital LLC ("Litong") from drawing on a standby letter of credit. (Doc. 1.) GP3 argues a TRO is necessary to prevent BOTW and Litong from facilitating a material fraud. The Court held a telephone hearing on the motion for a TRO on June 9, 2020. For the following reasons, the request for a TRO is **GRANTED** and GP3 is directed to post a $21,000,000.00 bond.

## I. BACKGROUND

In 2018, New Mexico Regional Water, LLC ("NM Water") began obtaining financing to build a water pipeline in New Mexico ("the Project"). (Verified Compl., Doc. 1, ¶¶ 1, 9.) To secure financing, NM Water asked Garney Construction – who was interested in serving as the general contractor – to invest in the Project. (*Id.* at ¶ 10.) GP3 (an affiliate of Garney Construction) subsequently agreed to loan NM Water money to facilitate the issuance of a standby letter of credit ("SBLC") to support financing of the Project. (*Id.* at ¶ 11.)

NM Water also sought financing from CIG Capital LLC ("CIG"), and CIG later involved Litong in the Project. (*Id.* at ¶ 12, 17.) The parties dispute whether Litong was involved in the Project to offer funding or to source materials for the Project. Regardless, on February 15, 2019,

Litong purportedly entered into a contract with GP3 in the amount of $19,978,350.00 for "[p]iping for GP3's construction of New Mexico Regional Water." (Doc. 17-1, pp. 16–19.)[1] The contract described the pipe as

> 40' joints of 3/8" thick welded steel pipe that is 36" in diameter, lined with ¼ inch cement mortar and coated with ¼ inch cement plus wrapped in plastic for corrosion protection[.]

(*Id.* at p. 16.) The contract also provided that various documents would be created pursuant to the transaction, including:

- Five copies of an invoice indicating the contract number and shipping mark;
- A certificate of origin of the goods;
- A certificate of quality and quantity in one copy issued by the manufacturers; and
- A buyer-signed receipt of quality and quantity

(*Id.* at p. 18.)

The contract was purportedly signed by Ron Green, in his capacity as a "Partner" for GP3. However, Ron Green is the President and Manager of NM Water. (Green Affidavits, Doc. 6-2, ¶ 2; Doc. 25-4, ¶ 2.) Green states that he "had no authority to sign any document on behalf of GP3 or to bind GP3." (Doc. 25-4 at ¶ 7.) Green further asserts that he "did not execute the [February 15, 2019 contract, (Doc. 23-3)] . . . in [his] individual capacity, or in [his] capacity as the President and Manager of NM Water, or as a Partner of GP3." (Doc. 25-4, ¶ 8.)

Later, NM Water, CIG, and GP3 amended the existing SBLC. (Doc. 1, ¶ 18.) The amendment provided that the SBLC would be issued by JP Morgan Chase Bank ("JP Morgan") "in favor of BOTW with further credit to" Litong, with Litong as the Beneficiary of the SBLC. (*Id.*; Doc. 1-3, p. 3.) Under the terms of the SBLC (as amended), before a draw may occur JP

---

[1] All page numbers refer to the Court's CM/ECF system and may not match the document's original pagination.

Morgan must be presented with a signed statement by an authorized representative of Litong stating:

> We hereby draw USD . . . under JPMorgan Chase Bank N.A. letter of credit No. NUSCGS029318 and certify that GP3 II, LLC (the "Account Party") has defaulted in remitting invoice payment for the New Mexico Regional Water Project . . . and that payment is sixty (60) days past due. We further certify that a notice was sent ten (10) days prior to the date of this draw to the Account Party . . . advising of our intent to draw on JPMorgan Chase Bank, N.A. letter of credit and the amount of the draw represents the amount that is past due and owed at the time of the draw.

(Doc. 1-11, pp. 2–3.) In this way, the SBLC purportedly secured payment for the pipe in the event GP3 did not pay for it. The SBLC was not available for drawing prior to June 11, 2020 and expires on June 26, 2020. (Doc. 1, ¶ 28.)

In June 2019, Litong approached BOTW about purchasing Litong's right to payment on the February 15, 2019 contract between Litong and GP3. Litong eventually sold its rights under the contract to BOTW in return for partial payment of the contracted amount. (Doc. 23-14.) Litong remains the Beneficiary of the SBLC, but Litong assigned the proceeds from the contract to BOTW. (*Id.* at p. 9; *see also* Doc. 23-16, pp. 2–4.)

On July 5, 2019, Litong created an invoice seeking payment on the contract. (Doc. 17-1, p. 30.) On July 10, 2019, Litong asked GP3 to acknowledge the July 5, 2019 invoice.[2] (Doc. 1-7.) GP3 subsequently inquired with NM Water and CIG as to why Litong created a "bogus invoice." (Doc. 1, ¶ 31; Doc. 1-9.) In an email on July 12, 2019 to CIG, Steve Lin[3] explained that

> [BOTW] requires that we provide clarification regarding where this money is going. The money is for a larger project including materials, equipment, investors, labor and operations of a water project in New Mexico. The problem is that investors, labor, and operations aren't clear that can be put into an invoice. Materials are easier for [Litong] to explain to [BOTW] in a simple invoice. [CIG]

---

[2] The invoice presented to GP3, (Doc. 1-8), does not contain the signature of Green; however, BOTW has submitted different versions of the same invoice with Green's signature, (Doc. 23-6; Doc. 23-8.)

[3] The parties dispute Steve Lin's role in the project: GP3 believed that Lin was a representative of Litong; Litong believed that Lin was a broker for GP3. (Doc. 25, p. 2; Doc. 29, pp. 4–5.)

3

> told me that this SBLC will be used to fund all of these items so that's why we chose the materials; it's a lot easier. The invoice is not bogus. This is a partial amount given by the manufacture of materials that the project needs. [Litong] understands that . . . [CIG does not] want us to call the SBLC and only use for collateral. We don't intend to call it. We just need it there for our collateral when we give you the funding for the project and if our funds are not returned. We can give an undertaking to you if this will help.

(Doc. 6-1.) Lin's response did not reference the February 15 contract or any contract for pipe.

On March 20, 2020, GP3 sent a letter to NM Water, CIG, and BOTW demanding that BOTW surrender the SBLC to JP Morgan by no later than April 3, 2020. (Doc. 23-22, pp. 2–3.) On May 7, 2020, BOTW confirmed that it anticipated collecting on the SBLC. (Doc. 1, ¶ 52.) This lawsuit followed.

On June 10, 2020, the Court granted the motion for a TRO "temporarily" to allow the parties an opportunity to fully develop the relevant issues before the Court. (Doc. 27.) After considering the parties' briefing and the relevant law, the Court concludes that GP3's motion for a TRO should be granted.

## **II. DISCUSSION**

The Court has the authority to issue a temporary restraining order under Federal Rule of Civil Procedure 65. The standard for a temporary restraining order involves consideration of four factors:

(1) the threat of irreparable harm to the movant;

(2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant;

(3) the probability that movant will succeed on the merits; and

(4) the public interest.

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). While "a court must consider all of the factors to determine whether the balance weighs toward granting the injunctive

relief," the likelihood of success on the merits is the most significant factor. *E.g.*, *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013). "To that end, the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *Id.*

## A. GP3 is Likely to Succeed on the Merits

GP3 seeks an injunction pursuant to its allegations of fraud under § 5-109 of the Uniform Commercial Code ("UCC"). Section 5-109 applies to letters of credit, and specifically to a court's power to enjoin presentation on a letter of credit due to fraud and forgery.[4] GP3 presents several arguments to establish that any certification by Litong would be materially fraudulent. The Court agrees that GP3 is likely to succeed on its claim of material fraud because the evidence suggests that the pipe allegedly ordered by GP3 does not exist, making it unnecessary to address GP3's other arguments.

### *1. Injunctive Relief under § 5-109(b)*

Section 5-109(b) states that

(b) If an applicant claims that a required document is forged or materially fraudulent or that honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant, a court of competent jurisdiction may temporarily or permanently enjoin the issuer from honoring a presentation or grant similar relief against the issuer or other persons only if the court finds that:

> (1) the relief is not prohibited under the law applicable to an accepted draft or deferred obligation incurred by the issuer;
>
> (2) a beneficiary, issuer, or nominated person who may be adversely affected is adequately protected against loss that it may suffer because the relief is granted;
>
> (3) all of the conditions to entitle a person to the relief under the law of this State have been met; and

---

[4] GP3 suggests that the Court should apply Missouri's version of the UCC, (Doc. 6, p. 9, n.3); BOTW argues that Florida's version of the UCC applies, (Doc. 23, p. 11, n.5). Both Missouri and Florida have adopted UCC § 5-109 in its entirety, and the parties do not suggest that the choice of law affects the Court's analysis. Therefore, the Court will cite to the UCC generally.

5

> (4) on the basis of the information submitted to the court, the applicant is more likely than not to succeed under its claim of forgery or material fraud and the person demanding honor does not qualify for protection under subsection (a)(1).

Comment 1 to § 5-109 explains that "[m]aterial fraud by the beneficiary occurs only when the beneficiary has no colorable right to expect honor and where there is no basis in fact to support such a right to honor." The comment also cites several cases decided prior to § 5-109's adoption in 1995 that support this interpretation. In particular, it cites the First Circuit's decision in *Ground Air Transfer, Inc. v. Westate's Airlines, Inc.*, 899 F.2d 1269 (1st Cir. 1990), for the proposition that "where the contract and the circumstances reveal that the beneficiary's demand for payment has absolutely no basis in fact, [or] where the beneficiary's conduct has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served, *then* a court may enjoin payment." *Ground Air Transfer, Inc. v. Westate's Airlines, Inc.*, 899 F.2d 1269, 1272–73 (1st Cir. 1990) (citations omitted). And, cases and commentators agree that the standard is met if the beneficiary materially fails to perform on the underlying contract, in which case an injunction is justified to prevent the beneficiary from obtaining payment it is not entitled to by drawing on the letter of credit. *E.g.*, *Langley v. Prudential Mortg Capital Co.*, 554 F.3d 647, 648–49 (6th Cir. 2009); *Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 769 N.E.2d 619, 640 (Ohio 2002); *Intrinsic Values Corp. v. Superintendencia De Administracion Tributaria*, 806 So. 2d 616, 618 (Fla. Dist. Ct. App. 2002); *Regent Corp., U.S.A. v. Azmat Bangladesh, Ltd.*, 253 A.D.2d 134, 140, 686 N.Y.S.2d 24, 28 (1999); 3 WHITE, SUMMERS & HILLMAN, U.C.C. § 26:38 (6th ed. 2014).

Here, GP3 is the applicant,[5] and the required document is a signed statement from Litong certifying that (1) GP3 defaulted on an invoice for the Project, (2) the payment is sixty days past due, (3) a notice was sent to GP3 ten day prior advising of Litong's intent to draw on the SBLC, and (4) the amount of the draw represents the amount that is past due and owed at the time of the draw. (Doc. 1-11, pp. 2–3.) As discussed below, the Court finds that GP3 is likely to succeed on its claim of material fraud because the evidence suggests that the pipe allegedly ordered by GP3 does not exist, so any statement by Litong that GP3 is due and owing on an invoice for pipe would be materially fraudulent.

GP3 has presented evidence suggesting there is no pipe ready for shipment, and Litong's response does not sufficiently contradict GP3's evidence. As an initial matter, the Court is not convinced that the photographs provided by Alice Song (the President of Litong) represent the pipe allegedly ordered by GP3. On June 8, 2020, Litong filed suggestions in opposition to the motion for a TRO, attaching a declaration from Song. (Doc. 17-1, pp. 2–6.) In her declaration, Song states that "[o]n June 5, 2020 and for the purposes of the present dispute, I instructed that photographs of the product at issue be taken. Attached hereto as Exhibit F are 8 pictures of the products that were procured per the GP3 Contract and are still under Litong's control." (*Id.* at p. 4.) The photographs depicted pipe in various sizes and stages of production, which would clearly not conform to the alleged contract between GP3 and Litong. (*Id.* at pp. 31–38.) One of the photographs also contained what appeared to be a watermark, suggesting that the pipe in the photograph was not the pipe to be provided under the contract. (*Id.* at p. 34.) GP3 also provided evidence that the photographs were taken from other pipe manufacturers' websites, further indicating that the pipe does not exist. (*See* Twait Affidavit, Doc. 25-1, ¶ 7–16) (using a reverse

---

[5] An "applicant" is the person at whose request or for whose account a letter of credit is issued. *See* UCC § 5-102. The parties do not dispute that GP3 is the applicant under these circumstances.

Google and/or Bing search to demonstrate that the "current" photographs provided by Song previously existed on other pipe manufacturers' websites.)

After the parties discussed issues with the photographs during the Court's telephone hearing on June 9, 2020, Song submitted a supplemental declaration and new photographs of the pipe. (Doc. 29-1, pp. 2–9.) Song explained that – despite her prior sworn affidavit to the contrary – the previous photographs "were not recent but were taken previously and were used in marketing materials." (*Id.* at p. 2.) Song represents that the pipe ordered by GP3 is portrayed in the new photographs. Nevertheless, the Court is still not convinced that the new photographs depict pipe that complies with the terms of the contract. GP3 supposedly contracted for

> 40' joints of 3/8" thick welded steel pipe that is 36" in diameter, lined with ¼ inch cement mortar and coated with ¼ inch cement plus wrapped in plastic for corrosion protection[.]

(Doc. 17-1, p. 16.) However, the pipe in the photographs does not appear to comply with these specifications. In response to Song's second affidavit, GP3 provided the affidavits of Scott Parrish (the President of Garney Companies, Inc.) and Richard Mueller (the President of the American Concrete Pressure Pipe Association). (Doc. 30-1; Doc. 30-2.) Parrish states that the pipe in the photographs is not lined with cement mortar and some of the photographs depicted pipe that is not 36 inches in diameter. (Parrish Affidavit, Doc. 30-1, ¶¶ 5–8; Doc. 17-1, p. 16.) Mueller similarly testified that "[i]t is highly unlikely the pipe in the pictures . . . are 36 inches in diameter" and that "[t]he pipe in the pictures are also not 40 feet in length under any circumstances." (Mueller Affidavit, Doc. 30-2, ¶¶ 3–4, 10; Doc. 17-1, p. 16.)

The only other evidence provided by Litong to support the existence of the pipe is a purchase order, (Doc. 29-1, pp. 15–17), but the Court is not persuaded by this evidence either. First, the purchase order was placed on June 29, 2019, and states that the product would be

delivered "at the factory" on July 9, 2019. (*Id.* at p. 17.) The Court finds that it is highly unlikely that a manufacturer would be able to create pipe conforming to the specifications of the contract within such a narrow time frame. For example, Parrish states that, based on his thirty-two years of experience working with water pipeline projects, "the design and manufacturing time required to mill, weld, line and coat 4,995 pieces of 40-foot length 36-inch pipe (more than 37 miles of pipe) cannot be accomplished in 6 days; rather, the process of designing and manufacturing this amount of pipe would take at least a year to complete."[6] (Parrish Affidavit, Doc. 30-1, ¶ 9.) Similarly, Mueller states that the purported contract called for "pipe characteristics that are not typical for pipe made for either petrochemical or water transmission industries, and so pipe meeting the 'Specifications' could not have been made ahead of the date Ms. Song presents that she issued the purchase order." (Mueller Affidavit, Doc. 30-2, ¶ 10.) Mueller also notes that "[t]he minimum machine time to produce the quantity of pipe described in the "Specifications" is more than 43 days, and shipping this volume of pipe would require more than 500 truck-loads." (*Id.*)

Moreover, Litong has redacted the name and contact information of the seller listed on the purchase order, making it impossible to verify the order. (Doc. 29-1, pp. 15–17.) Song states that she redacted the supplier name because "Litong's competitive advantage is in being able to source equipment and material purchases from appropriate suppliers and manufacturers that we know can deliver within sometimes aggressive timeframes and at competitive prices." (Song Affidavit, Doc. 29-1, ¶ 6.) However, Song does not adequately explain why disclosing the name of the manufacturer in this case would compromise Litong's competitive advantage. In fact, the

---

[6] Song testified that after she placed the order for the pipe, the "products were procured and ready about six days" later. (Song Affidavit, Doc. 29-1, ¶ 8.)

purported contract between GP3 and Litong provided that the following documents be provided to GP3, which would have disclosed the identity of the manufacturer to GP3:

- Invoice in five copies indicating the contract number and shipping mark;
- Certificate of origin of the goods;
- Certificate of quality and quantity issued **by the manufacturers**; and
- Buyer-signed receipt of quality and quantity of the goods.

(Doc. 17-1, p. 18) (emphasis supplied.) Litong has not alleged that any such documents exist, let alone provided any conforming documents to GP3, or more importantly, to the Court. This is particularly telling, given the current dispute about the pipe's existence. Lastly, Litong has not offered invoicing from the manufacturer, a bill of lading, a packing list, or any other supporting documentation.

For all of these reasons, the available evidence suggests that no pipe conforming to the specifications of the contract exists, and presentation of a statement that GP3 is due and owing on an invoice for such pipe would be materially fraudulent. *See* UCC § 5-109, cmt 1 (noting that submission of an invoice where there is a complete absence of consideration constitutes material fraud); *see also New Orleans Brass, L.L.C. v. Whitney Nat. Bank*, 818 So. 2d 1057, 1063 (La. App. 4 Cir. 5/15/02) (describing material fraud under § 5-109(b) as a failure which is "so serious as to make it obviously pointless and unjust to permit . . . collecting on the letter of credit.")

### *2. Additional Requirements under § 5-109(b)*

The Court next analyzes subparts (1)–(4) of § 5-109(b). Subpart (1) is not implicated under the present circumstances. Under subpart (2), the Court finds that the $21,000,000.00 bond posted by GP3 will adequately protect Litong (the beneficiary) and BOTW against any loss it may suffer

from issuance of the TRO.[7] Subpart (3) incorporates the common law requirements for issuance of a TRO, which, as discussed throughout this Order, the Court finds have been met.

Finally, subpart (4) requires that GP3 be more likely than not to succeed under its claim of forgery or material fraud *and* the person demanding honor does not qualify for protection under subsection (a)(1).[8] As discussed above, the Court found that GP3 is likely to succeed under its claim of material fraud. Additionally, BOTW does not qualify for protection under subsection (a)(1), which states

> (a) If a presentation is made that appears on its face strictly to comply with the terms and conditions of the letter of credit, but a required document is forged or materially fraudulent, or honor of the presentation would facilitate a material fraud by the beneficiary on the issuer or applicant:
>
> > (1) the issuer shall honor the presentation, if honor is demanded by
> >
> > > (i) a nominated person who has given value in good faith and without notice of forgery or material fraud,
> > >
> > > (ii) a confirmer who has honored its confirmation in good faith,
> > >
> > > (iii) a holder in due course of a draft drawn under the letter of credit which was taken after acceptance by the issuer or nominated person, or
> > >
> > > (iv) an assignee of the issuer's or nominated person's deferred obligation that was taken for value and without notice of forgery or material fraud after the obligation was incurred by the issuer or nominated person;

BOTW argues that it is protected by § 5-109(a)(1) because it "acted in good faith; it purchased the invoice for value and without notice of forgery or material fraud and relied on the guaranteed

---

[7] Litong requests that GP3 be ordered to secure a $38,000,000.00 bond because BOTW has frozen a "separate [SBLC] issued in connection with an entirely separate project of Litong's with a separate buyer." (Doc. 17, p. 14.) However, the TRO does not affect the separate SBLC, so there is no reason to secure that SBLC. *See* FED. R. CIV. P. 65(c). Therefore, Litong's request for a $38,000,000.00 bond is denied.

[8] Litong does not argue that it is protected by § 5-109(a)(1), and the Court agrees that Litong does not fall within the categories of protected persons.

payment of the SBLC." (Doc. 28, p. 4.) However, assuming § 5-109(b) applies to BOTW (given that it is not the party presenting to JP Morgan, and therefore not the party requesting honor on the SBLC), it does not explain how it fits into any of the subparts of § 5-109(a)(1). In fact, BOTW admits that it "does not fit perfectly" into § 5-109(a)(1)(iv), and does not claim to be a nominated person, confirmer, or a holder in due course of a draft drawn under the SBLC. (Doc. 28, pp. 4, n.5.) Moreover, although BOTW was assigned the proceeds of the Litong/GP3 contract, BOTW does not explain how its status as an assignee of proceeds entitles it to protection under § 5-109. The Court sees no legal basis to extend the protections of § 5-109(a)(1) beyond its express terms. For these reasons, the Court finds that BOTW does not qualify for protection under § 5-109(a)(1).

In summary, under § 5-109 the court may temporarily enjoin JP Morgan from honoring a presentation on the SBLC if the court finds that the elements of § 5-109(b) have been met. Here, the Court finds that GP3 is likely to succeed on its claim that the elements of § 5-109(b) have been satisfied.

### B. The Remaining *Dataphase* Factors

Although the likelihood of success on the merits is the most important of the *Dataphase* factors, the remaining factors also weigh in favor of issuing a TRO. First, GP3 has demonstrated that it has no adequate remedy at law and will suffer irreparable harm absent issuance of the TRO. GP3 asserts that allowing BOTW to draw on the SBLC "would further harm GP3's reputation and goodwill" because "lenders and investors will not want to risk loaning money to an entity that allegedly defaulted on an invoice and had a standby letter of credit called." (Doc. 6, p. 13.) "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (*quoting United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002)). Here, absent the issuance

12

Case 4:20-cv-00424-BP   Document 32   Filed 06/18/20   Page 12 of 13

of the TRO, GP3 would suffer immediate, irreparable harm to its reputation and credibility such that its ability to obtain funding from similar lenders would be severely hampered.  Allowing a draw on the SBLC under these circumstances would be particularly harmful given that GP3 is still pursing funding for the Project.  (Doc. 6, p. 13.)  Accordingly, the Court finds that GP3 has demonstrated it will suffer irreparable harm absent issuance of the TRO.

Second, the Court finds that the potential harm to GP3 outweighs any injury the injunction will inflict on Defendants because GP3 will be required to post a $21,000,000 bond.  Finally, the public interest in prohibiting material fraud is best served by granting the motion for temporary restraining order.

### III. CONCLUSION

For all these reasons, the Court **GRANTS** GP3's motion for a TRO and hereby enjoins Defendants from drawing on the SBLC or assigning their rights to a third party.  GP3 is directed to post a $21,000,000.00 bond.

**IT IS SO ORDERED.**

Date: June 18, 2020

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
UNITED STATES DISTRICT COURT